# In the United States District Court
## for the
## Western District of Texas

CANTEX ENERGY CORP.     §
       Plaintiff,     §
    v.     §
    §     Civ. No. SA-09-CA-0218-XR
WORLD STOCK EXCHANGE, LLC;     §
and BRETT REISS     §
       Defendants.     §

## ORDER

On this date, the Court considered Defendants' Rule 12(b)(2) Motion to Dismiss under 28 U.S.C. § 1406(a) and Rule 12(b)(1), 12(b)(2), and 12(b)(6) (docket no.3), Plaintiff's Response (docket no. 10), and Defendants' Reply (docket no. 11). After careful consideration, the Court denies the motion.

## I. Factual Background[1]

Plaintiff Cantex Energy Corp. ("Cantex") is an oil and gas exploration company organized under the laws of Nevada with its principal place of business in San Antonio, Texas. Compl. ¶ 7. In February 2007, Brett Reiss, an officer of Defendant World Stock Exchange ("WSE"), contacted Trace Maurin, the President of Cantex, by telephone at Cantex's office in San Antonio. Decl. of

---

[1] When ruling on a motion to dismiss for lack of personal jurisdiction without first holding an evidentiary hearing, a court takes as true the uncontroverted allegations in the complaint and resolves factual conflicts in the affidavits in favor of the plaintiff. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). The Court notes that Defendants have not submitted any affidavits or other evidence with their motion to dismiss or their reply.

Trace Maurin at ¶ 1, 3. This was a "cold call," and Maurin had never heard of WSE before. *Id.* at ¶ 3; Compl. ¶ 16. WSE is a Nevada LLC that has its principal place of business in Scottsdale, Arizona. Compl. ¶ 8; Reply at 2.[2] Reiss represented that his company raised capital and investments for companies like Cantex. Decl. of Trace Maurin at 4. Maurin chose not to contract with WSE at that time. *Id.*

Reiss telephoned Maurin at his San Antonio office "many more times"[3] throughout the first half of 2007, requesting that Cantex enter into an agreement with WSE. *Id.* at ¶ 5. In each call, Reiss promised that he could raise funds for investment in Cantex and "could get the share price of Cantex to rise." *Id.* In August 2007, in response to another telephone call from Reiss, Maurin agreed that Cantex would hire Reiss and WSE. *Id.* at ¶ 6. Maurin states that he agreed to hire WSE based on Reiss's promises that WSE would help Cantex raise new investments, introduce Cantex to wealthy investors, and would perform other services to raise Cantex's share price. *Id.* at ¶ 6.

Maurin states that, relying on these promises, he caused Cantex to enter into the first agreement with WSE on August 22, 2007. *Id.* at ¶ 7. Reiss and WSE drafted the one-page "Consulting Agreement" and emailed it to Maurin in

---

[2] Plaintiff's Complaint alleges that WSE is an LLC organized under Arizona law. However, WSE's Reply states that it is a Nevada LLC.

[3] Maurin does not specify the number of times in his affidavit; however, the Complaint alleges that it was ten to fifteen times. Compl. ¶ 17.

Texas. *Id.* at ¶ 7. Under the agreement, Reiss and WSE[4] would provide "certain consulting services" on a "non-exclusive, best-efforts basis" to Cantex, and Cantex would pay WSE a $5,000 non-refundable retainer plus 10% of the value of any financing transaction. *Id.* at ¶ 8; Pl. Ex. A. WSE could elect to take 7% of the 10% in restricted shares of Cantex stock issued in Reiss's name. Pl. Ex. A. The Consulting Agreement did not include a term or expiration date.

On August 24, 2007, Cantex signed a second one-page agreement for "IR services,"[5] which was also drafted by Reiss and WSE and emailed to Maurin in Texas. *Id.* at ¶ 9. Reiss asserted that "IR services" warranted further compensation, and he promised that these services would raise Cantex's share price, introduce Cantex to wealthy investors interested in investing in Cantex, and provide additional business opportunities. *Id.* at ¶ 10. Under the terms of the "IR Agreement," WSE would provide "certain IR services," which were not defined, on a non-exclusive, best-efforts basis for a period of six months, and Cantex would pay WSE $259,200, consisting of six installments of $9,800 per month and a lump sum payment of $200,400 in Cantex shares issued in the name of Reiss or his designee. *Id.* at ¶ 11; Pl. Ex. B. Both agreements contained a "No Dispute" clause, which stated that "No dispute regarding this [Consulting or IR] Agreement that is signed by both parties shall be enforced. CTXE understands and agrees completely that WSE has and will provide the necessary

---

[4] The Consulting Agreement states both that WSE and Reiss will provide consulting services.

[5]"IR" refers to investor relations.

services to CTXE. Consequently, there will not be any disputes about this [Consulting or IR] Agreement in the future." Pl. Ex. A, B. Further, both agreements contained a bold clause under the signature lines that stated, "Faxed transmission of signature will be considered a legal and binding signature, and WSE will be entitled to any legal fees incurred resulting from the enforcing of the Agreement according to AZ law." Pl. Ex. A, B.

In November 2007, Reiss and WSE asked Cantex to enter into another "IR Services" Agreement, again promising to raise the share price, raise capital, and introduce Cantex to investors. Decl. of Trace Maurin at ¶ 12. Cantex was hesitant to enter another agreement because it had seen little, if any, work product by WSE. *Id.* Reiss urged Cantex to enter into the new Agreement because he alleged that a potential investor who was about to invest in Cantex "wanted to know that there will be market support after any funding," although the alleged investor never invested money in Cantex, nor did Cantex receive information about the investor. *Id.* at ¶ 13. Reiss told Maurin that the terms of the Agreement were identical to the prior agreement other than the monetary terms and duration. *Id.* at ¶ 14. Because Cantex was in a difficult financial position, of which Reiss was aware, and because of Reiss's aforementioned promises, Cantex entered the new deal. *Id.* at ¶¶ 12, 15. Reiss and WSE drafted the third IR Agreement and emailed it to Maurin in Texas. *Id.* at ¶ 15. The IR Agreement, dated November 19, 2007, was substantially similar to the prior agreement, except that the term of the new agreement was twelve months, the

payments to WSE and Reiss were larger, the deal was made contingent upon WSE getting an offer for funding for Cantex and Cantex accepting the offer, and the faxed transmission clause under the signature lines was altered. Maurin was not informed and did not see that a portion of the faxed transmission clause was changed by Reiss and WSE. *Id.* at ¶ 17, 18. The new clause provided that "[f]axed transmission of signature will be considered a legal and binding signature, and WSE will be entitled to any legal fees incurred resulting from the enforcing of this Agreement *and will be litigated in AZ.*" Pl. Ex. C (emphasis added).

On February 11, 2008, Cantex and WSE entered into an "Addendum/Amendment to Agreement" that removed the contingency clause from the second IR Services Agreement. Decl. of Trace Maurin at ¶ 19. Maurin entered this amendment only because Reiss claimed to have $250,000 "ready for him to pull the trigger." *Id.*

During the term of the Agreement, Maurin received numerous e-mail communications from Reiss requesting monies he alleged were owed under the Agreements. *Id.* at ¶ 21. Reiss additionally requested money for personal expenses. *Id.* at ¶ 24. Specifically, in March and April 2008, Reiss sent Maurin at least seven emails requesting money so that he could pay his realtor and close on his home. *Id.* at ¶ 25. Further, Reiss represented that he and WSE were performing work on behalf of Cantex and that WSE was raising Cantex's share price, but Cantex never received any work product from WSE, never received a

5

single investment in the company as a result of WSE, and never saw any appreciable rise in its share price. *Id.* at ¶ 21-23. However, Cantex paid WSE and Reiss $376,000 in cash and issued 8.65 million shares of Cantex stock to Reiss and his family members. *Id.* at ¶ 26.

On March 23, 2009, Cantex filed this lawsuit, alleging claims for fraudulent inducement, fraud, breach of contract, deceptive trade practices, and tortious interference with Cantex's prospective business relationships. Specifically, Plaintiff brings a fraudulent inducement claim against both WSE and Reiss, alleging that they made misrepresentations to Cantex in Texas with the intent that Cantex rely on the misrepresentations. Plaintiff also brings a fraud claim against both WSE and Reiss, alleging that they made material misrepresentations about the services they were providing to Cantex, intending that Cantex rely on the misrepresentations. Plaintiff asserts a claim for tortious interference with prospective business relations against both WSE and Reiss, alleging that their acts with regard to holding onto the Cantex shares and disbursing them to other parties prevents Cantex from entering into agreements with other potential investors.

Against WSE alone, Plaintiff brings causes of action for breach of contract based on WSE's alleged failure to provide the contracted-for services and for DTPA violations. The DTPA violations are that WSE allegedly engaged in false, misleading, and deceptive practices as defined in § 17.46, including representing that its services have sponsorship, approval, characteristics, ingredients, uses,

benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; representing that its services are of a particular quality, standard, or grade if they are of another; representing that work or services have been performed when they were not; and failing to disclose information concerning services that was known at the time of the transaction, and such failure was intended to induce Cantex into a transaction that it would not otherwise have entered.

Defendants filed the instant motion to dismiss, arguing that this Court lacks personal jurisdiction over them and that there is a mandatory forum selection clause setting venue in Arizona. Personal jurisdiction is typically decided in advance of venue,[6] and the Court thus turns to that issue first.

## II. Motion to Dismiss For Lack of Personal Jurisdiction

A "federal court sitting in diversity may assert jurisdiction if (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the fourteenth amendment to the United States Constitution." *Johnson v. Multidata Systems Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 616 (5th Cir. 1989)). Texas's long-arm statute extends to the limits of federal due process; therefore, the two-step inquiry folds into one due process analysis. Due process requires the plaintiff to prove that 1) the non-resident purposely availed himself of the benefits and protections of the forum state by establishing "minimum

---

[6] *Leroy v. Great W. United Co.*, 443 U.S. 173, 180 (1979); *Assetworks v. City of Cincinnati*, Civ. A. No. SA:02-CV-351, 2003 WL 25463096 (W.D. Tex. Mar. 31, 2003).

contacts" with the state; and 2) the exercise of the jurisdiction does not offend traditional notions of fair play and substantial justice. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).

The due process clause of the Fourteenth Amendment protects an individual's liberty interest in not being subject to the binding judgments of a forum within which he has no meaningful "'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Minimum contacts with a state may arise incident to a federal court's general or specific jurisdiction over a nonresident defendant. *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990). In a "no hearing situation, a plaintiff satisfies his burden by presenting a *prima facie* case for personal jurisdiction." *Id.*

Plaintiff does not contend that this Court has general jurisdiction over Reiss and WSE. However, it does contend that Texas courts have specific jurisdiction over both defendants. The Fifth Circuit has articulated a three-step analysis for the specific jurisdiction inquiry: "(1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *See Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002). If the Plaintiff

successfully satisfies the first two prongs, the burden shifts to the Defendants to defeat jurisdiction by showing that its exercise would be unfair or unreasonable. *Id.* at 382.

Further, the Fifth Circuit rather recently decided as an issue of first impression that specific personal jurisdiction is a claim-specific inquiry, holding that "[a] plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish personal jurisdiction for each claim." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006).[7] Accordingly, in the absence of general personal jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts. *Id.* at 275.

_____

[7] This Court has previously applied *Seiferth* in a case involving claims for breach of contract and tort, concluding that *Seiferth* does not require a plaintiff to separately establish specific personal jurisdiction for each claim when all claims arise out of the same forum contacts, but rather that due process permits a court to assert jurisdiction over all related claims that arise out of a defendant's minimum contacts with the forum. *Sutton v. Advanced Aquaculture Systems, Inc.*, Civ. A. No. SA-07-CA-175-XR, 2007 WL 2220900 (W.D. Tex. 2007). Similarly, in *Kapche v. Philip Seifert & Liberty Capitol*, Civ. A. No. H-06-00083, 2007 WL 2915003 (S.D. Tex. Oct. 4, 2007), Judge Miller acknowledged *Seiferth*, but noted that specific jurisdiction for each claim did not need to be addressed separately because the actions giving rise to the claims of breach of contract, fraud, and negligent misrepresentation were "either the same or intertwined and also involve the same parties."

Plaintiff in this case fails to differentiate among its five claims and never expressly mentions or discusses its breach-of-contract, DTPA, and tortious interference claims, apparently relying solely on the allegations supporting its fraud and fraudulent inducement claims to establish personal jurisdiction. As a result, Plaintiff fails to specify whether all its claims arise out of the same contacts or whether they arise from different contacts such that they must be analyzed separately. After reviewing the pleadings and evidence, the Court concludes that the claims generally arise out of the same forum contacts. However, in an abundance of caution and to ensure compliance with the Due Process Clause, the Court will analyze each claim separately.

## A. Minimum Contacts and Specific Jurisdiction

The first steps of the analysis ask whether the Defendants have minimum contacts with Texas, and whether the Plaintiff's cause of action arises out of or results from the Defendants' forum-related contacts.

### 1. *Fraudulent Inducement (against WSE and Reiss)*

Plaintiff alleges that Defendants sent communications containing misrepresentations to the Plaintiff in Texas with the intent that Plaintiff rely on them. Specifically, Plaintiff references ten to fifteen phone calls made by Reiss to Cantex between February and August 2007, each of which contained fraudulent promises and misrepresentations that Reiss and WSE intended that Cantex rely on, and which Cantex did rely on in entering the August 2007 Consulting and IR Services Agreements. In addition, Plaintiff points to similar misrepresentations, as well as a specific misrepresentation concerning a potential investor, Mike Brette, that Reiss made in communications with Maurin in Texas, with the intent that Plaintiff rely, and on which it did rely in entering the November 2007 IR Services Agreement.

The Fifth Circuit has held that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment. The defendant is purposefully availing himself of 'the privileges of causing a consequence' in Texas." *Wein Air Alaska Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999); *see also Lewis v. Fresne*, 252 F.3d 352, 359 (5th Cir. 2001); *Guidry v. United States Tobacco Co., Inc.*, 188 F.3d

619, 628 (5th Cir. 1999) ("[W]hen a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state, including federal courts, to exercise personal adjudicative jurisdiction over the tortfeasor and the causes of action arising from its offenses or quasi-offenses."). Personal jurisdiction is not established for even an intentional tort where the only jurisdictional basis is the alleged harm to a Texas resident. *Stroman Realty v. Wercinski*, 513 F.3d 476, 486 (5th Cir. 2008). Rather, the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum. *Id.*

Plaintiff's fraudulent inducement claims are based on the actual content of communications that WSE and Reiss purposefully directed toward a Texas company in Texas. Accepting the Plaintiff's allegations as true, WSE and Reiss on numerous occasions misrepresented their abilities and intentions to perform services on Cantex's behalf, intending that Cantex would rely on the misrepresentations. Plaintiff has alleged that WSE and Reiss knew and intended that Cantex, a Texas resident, would rely on the information it provided via email and phone conversations to enter into an ongoing business relationship with WSE, and that the communications would have an effect in Texas, and thus WSE and Reiss could foresee that they would be haled into court in Texas based on those purposeful contacts with the forum. This is sufficient

to establish a prima facie case of specific personal jurisdiction.

### 2. *Fraud (against WSE and Reiss)*

Cantex's fraud claim alleges that WSE and Reiss made material misrepresentations about the services they were providing to Cantex during the term of the Agreements, including statements that they were increasing the Cantex share price, investing monies in Cantex, and were encouraging and succeeding in getting others to invest in Cantex. Compl. ¶ 62. Cantex alleges that Defendants knew the statements were false and misleading, and that they intended that Cantex rely on them. Compl. ¶¶ 63, 64. Further, Cantex alleges that it justifiably relied on the fraudulent misrepresentations by continuing to be engaged in the Agreements and paying WSE and Reiss compensation. Compl. ¶ 65. The Court concludes that, like the fraudulent inducement claim, Cantex has put forth a prima facie case of jurisdiction based on Defendants' alleged intentional misrepresentations directed at the forum.

Reiss attempts to invoke the fiduciary shield doctrine to preclude this Court's exercise of personal jurisdiction over him. The fiduciary-shield doctrine holds that an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual, though the state has personal jurisdiction over the corporation. *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). The court may assert jurisdiction over the officer, however, where the corporation is the alter ego of the officer. *Id*. Plaintiff did not claim in its Original Complaint that Reiss is the

alter ego of WSE. Rather, Plaintiff alleged facts to support an alter ego theory for the first time in its Response brief to Defendant's motion to dismiss, and Reiss argues that Cantex is therefore precluded from asserting an alter ego theory. The Court need not consider this issue, however, because, even if the corporate officer is not an alter ego of the company, the fiduciary shield doctrine does not prohibit jurisdiction where an individual defendant is sued for his own tortious acts that had reasonably foreseeable consequences in the forum. *See General Retail Services, Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed.Appx. 775, 795 (5th Cir. 2007) ("[W]hile the fiduciary-shield doctrine could prohibit this court from ascribing acts of Wireless Toyz to Simtob, it does not prohibit Simtob from being held personally liable for his own tortious conduct simply because he is an officer of a corporation.").

Prior to Cantex's entering the Agreement, Reiss personally made all of the phone calls to Cantex misrepresenting the marketing efforts that WSE would perform. Reiss also communicated to Cantex during the Agreement that he was performing services on behalf of Cantex. Furthermore, Reiss knew that Cantex was a Texas company and knew that any communications or acts directed at Cantex would have effects in Texas. Cantex is not trying to assert personal jurisdiction over Reiss based on jurisdiction over WSE, and thus the fiduciary shield doctrine does not bar the exercise of personal jurisdiction over Reiss.

3. *Deceptive Trade Practices Act Violations (against WSE)*

Cantex's DTPA claim is based on the same misrepresentations underlying

its fraudulent inducement and fraud claims, and thus the Court concludes that Cantex has established a prima facie case for personal jurisdiction on its DTPA claim based on WSE's alleged intentional misrepresentations directed at the forum.

### 4. *Breach of Contract (against WSE)*

Merely contracting with a resident of Texas and the preparatory exchange of communication do not meet the minimum contacts standard. *See Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986). Rather, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King v. Rudzewicz*, 471 U.S. 462, 479 (1985); *see also Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).

Defendant WSE relies on *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983), in support of its argument that personal jurisdiction is lacking. In *Hydrokinetics*, a Texas resident brought a breach-of-contract suit against an Alaskan defendant. The Fifth Circuit held that, "although the defendant negotiated a contract by phone and telefax with a Texas company, traveled to Texas to 'close' the deal, and agreed to purchase goods manufactured in Texas, there was no personal jurisdiction over the Alaskan defendant because (1) the defendant's only contacts with the state were related to a single transaction; (2) the plaintiff had initiated this single transaction by

14

contacting the defendant in Alaska; (3) the agreement's choice-of-law provision specified Alaskan law; and (4) the plaintiff delivered the goods it produced under the contract to the defendant in Seattle, Washington." *Latshaw*, 167 F.3d at 212-13.

In distinguishing *Hydrokinetics* in *Latshaw v. Johnston*, the Fifth Circuit noted that, "[i]n *Hydrokinetics*, the defendant had no more than a fortuitous connection to Texas related to a single transaction, initiated by the Texas plaintiff, and carried out in large part outside the Texas state boundaries. Johnston, by contrast, was much more than a one-shot purchaser of Texas goods whose only connection with the state grew out of a Texas manufacturer's marketing efforts. Rather, according to Latshaw's complaint and affidavit, Johnston entered into an ongoing business relationship with a Texas resident (and his company) and made multiple trips and phone calls to Texas in furtherance of that relationship." *Latshaw*, 167 F.3d at 213. This case is more like *Latshaw* and the cases cited therein[8] than *Hydrokinetics*.

Further, in *Central Freight Lines, Inc. v. APA Transport Corp.*, 322 F.3d 376, 382 (5th Cir. 2003), the Fifth Circuit found sufficient contacts for specific

---

[8] *See Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1206 (5th Cir. 1993) ("The parties had an ongoing business relationship, and the [nonresident defendant's] contacts with the forum state were not fortuitous."); *cf. Trinity Indus., Inc. v. Myers & Assocs., Ltd.*, 41 F.3d 229, 231 (5th Cir. 1995) (holding attorneys subject to personal jurisdiction when they had "deliberately availed themselves of benefits of ongoing relationship" with Texas client); *Bullion*, 895 F.2d at 217 (specific jurisdiction over nonresident doctor when forum state patient had ongoing relationship with doctor and treatment occurred partly in forum state).

personal jurisdiction based on the "fact that, during the course of negotiations, [the defendant] specifically and deliberately 'reached out' to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual relationship with a Texas corporation."  The Court noted that "a defendant can purposefully contact the forum state and avail itself of the benefits and protections of the forum's laws by creating continuing obligations between itself and residents of the forum.  Thus, this circuit has held that a nonresident can establish contact with the forum by taking purposeful and affirmative action, the effect of which is to cause business activity (foreseeable by the defendant) in the forum state."  *Id.* at 382 n.6 (citation omitted).

In this situation, WSE's contacts with Texas are not random and fortuitous.  Rather, WSE intentionally reached out to a Texas company with the purpose of establishing an ongoing relationship and causing business activity in Texas in the form of investments in a Texas company.  Reiss, on behalf of WSE, made repeated calls to Cantex in Texas over a period of several months to establish the initial contractual relationship, and WSE eventually entered into four different contracts with Cantex, the collective terms of which exceeded one year.  It is undisputed that the purpose of the contract was to benefit Cantex by finding investors for Cantex and thus the contract was intended to have business effects in Texas.  In addition, as part of its performance under the contract, WSE sent updates and information regarding potential investors to Cantex in Texas, and the contracts required ongoing contacts between WSE and Cantex in Texas.

Thus, the facts of this case are more in line with *Latshaw* and *Central Freight* than in those contract cases where specific personal jurisdiction has been found lacking. Under these circumstances, Defendant WSE could reasonably anticipate being haled into a Texas court.[9]

Alternatively, even if the breach-of-contract claim standing alone is insufficient for personal jurisdiction, to the extent that Defendant could reasonably anticipate being haled into a Texas court based on the alleged intentional torts, which involve the same contacts that form the basis of the breach-of-contract claim, due process would not be offended by allowing WSE to be brought before a Texas court on the breach-of-contract claim arising out of those same contacts. *See Sutton v. Advanced Aquaculture Sys.*, Civ. A. No. SA-07-CA-175-XR, 2007 WL 2220900 at *4-5 (considering the contract claim in conjunction with the fraud claim arising from the same set of contacts in concluding that personal jurisdiction existed); *see also S&D Trading Academy v. AAFIS, Inc.*, 494 F. Supp. 2d 558, 567 (S.D. Tex. 2007) (noting that plaintiff's tort claim was so intertwined with its breach-of-contract claim that due process would not be offended by an exercise of specific jurisdiction over both claims arising out of the same contacts).

---

[9] The Court recognizes that Defendants would assert that the forum selection clause would negate any such anticipation. However, as discussed more fully below, the Court finds that the forum selection clause is not a mandatory forum selection clause. Moreover, the disputed clause is contained in only one of the contracts, entered in November 2007, and thus, even if mandatory, would not negate reasonable anticipation with regard to Defendants' contacts related to the first two contracts.

5. *Tortious Interference with Prospective Business Relations (against WSE and Reiss)*

In this claim, Cantex alleges that it has been and is currently engaged with private investors who are seeking to invest in Cantex, that Defendants' acts with respect to holding onto the shares of Cantex and disbursing them to other parties, as well as continually demanding further compensation from Cantex have prevented and continue to prevent Cantex from entering into any agreements with its potential investors. Compl. ¶¶ 78, 79. Cantex alleges that WSE and Reiss, by purposefully holding on to Cantex shares, refusing to relinquish control thereof, and continuing to demand more monies while knowing that Cantex is seeking investors, intended and knew that this conduct would prevent Cantex from entering into other investor relationships. Compl. ¶ 80.

The Fifth Circuit has applied *Calder*'s effects test to claims for tortious interference with contract claims in several cases. In this context, the Fifth Circuit has held, the Court must determine whether the alleged tortfeasor expressly aimed his out-of-state conduct at the forum state by examining the nexus between the forum and the injured contractual relationship. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 402 (5th Cir. 2009); *see also Central Freight Lines, Inc. v. APA Transport Corp.*, 322 F.3d 376, 382 (5th Cir. 2003). Presumably, a similar analysis would apply to a claim for tortious interference with prospective business relations. However, because Plaintiff fails to address this claim in its Response, the Court lacks the necessary information to conduct

a well-informed analysis of the nexus between the forum and the injured prospective business relationship(s).

Of course, portions of the facts underlying this claim overlap with the contract and other tort claims, given that Reiss could not have obtained the shares without the parties' other dealings and contacts. The Court has already concluded that Defendants could reasonably anticipate being haled into a Texas court based on those contacts, and thus the Court finds that due process would not be offended by this Court's exercising jurisdiction over the tortious interference claim. Further, the alleged acts of retaining the stocks and knowingly preventing Cantex from obtaining investors in Texas are purposefully directed at Cantex in Texas. Thus, Cantex has established a prima facie case of jurisdiction on this claim. However, Cantex retains its ultimate burden to prove personal jurisdiction by a preponderance of the evidence, and thus Cantex would do well to introduce evidence regarding the nexus between the forum and the allegedly injured business relationships to satisfy its ultimate burden of proof for personal jurisdiction.

## B. Traditional Notions of Fair Play and Substantial Justice

"Once a plaintiff has established minimum contacts, the burden shifts to defendant to show the assertion of jurisdiction would be unfair. To show that an exercise of jurisdiction is unreasonable once minimum contacts are established, the defendant must make a 'compelling case' against it." *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). "The defendant 'must present a

compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Guidry v. United States Tobacco Co., Inc.*, 188 F.3d 619, 630 (5th Cir. 1999) (citing *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 207 (5th Cir. 1996)). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Id.*

When determining the fundamental fairness issue, courts will normally examine: "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Id.*

Texas has a significant interest in providing a forum for an action when the injured party is a Texas resident. *Lewis v. Fresne*, 252 F.3d 352, 359 (5th Cir. 2001)(stating that where a non-resident law firm's actions injured a Texas plaintiff, maintenance of the action would not offend traditional notions of fair play and substantial justice). "If a cause of action for fraud committed against a resident of the forum is directly related to the tortious activities that give rise to personal jurisdiction, an exercise of jurisdiction likely comports with the due process clause, given the obvious interests of the plaintiff and the forum state." *Wein*, 195 F.3d at 215. In *Wein*, the Fifth Circuit found jurisdiction to comport with notions of fair play and substantial justice notwithstanding the fact that the defendant was a German citizen. *Id.*

Admittedly, litigation in Texas would place a burden on WSE and Reiss.

However, "once minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant." *Id.* Resolving the conflicts in a light most favorable to the Plaintiff, there is no overwhelming burden to WSE or Reiss that outweighs the legitimate interests of the Plaintiff and the forum state. Defendants have not satisfied the burden of showing that the maintenance of this suit in Texas would violate traditional notions of fair play and substantial justice.

Accordingly, the motion to dismiss for lack of personal jurisdiction is denied.

## II. Motion to Dismiss based on Improper Venue

Defendants WSE and Reiss contend that the parties entered a contract with a forum selection clause stating that actions under the contract will be litigated in Arizona. Plaintiff argues that the clause is ambiguous and invalid as to Cantex. The clause at issue, which is present in the November 2007 IR Services Agreement but not the other agreements, provides in its entirety:

> Faxed transmission of signature will be considered a legal and binding signature, and WSE will be entitled to any legal fees incurred resulting from the enforcing of this Agreement and will be litigated in AZ.

A forum selection clause that is subject to "opposing, yet reasonable, interpretations," should be construed against the drafting party, in this case WSE. *See Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955, 957 (5th Cir. 1974). Plaintiff argues that the silence as to Cantex implies that the clause does not apply to Cantex's enforcement of the agreement, but only to suits brought by

WSE. Defendants maintain that the relevant clause refers to both WSE and Cantex because both parties are signatories to the contract. Because the clause does not clearly demonstrate that Cantex agreed to litigate its claims exclusively in Arizona and could reasonably be interpreted in multiple ways, the clause is ambiguous and must be construed against WSE. Construed against WSE, the clause does not clearly demonstrate the parties' intent to make Arizona the exclusive jurisdiction for suits brought by Cantex.[10] The Court need not reach the further issue of whether to enforce the clause. Accordingly, the motion to dismiss based on improper venue is denied.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss under 28 U.S.C. § 1406(a), Rule 12(b)(1), and 12(b)(2) (docket no. 3) is **DENIED**.

It is so ORDERED.

SIGNED this 4th day of August, 2009.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[10] Moreover, even if the clause were construed to apply to Cantex, the clause by its terms would apply only to disputes arising from the November 2007 Agreement, and not the August 2007 Agreements.